1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Sharon Wilson, *et al.*,                              No. CV-18-04216-PHX-JJT

10                        Plaintiffs,                       **ORDER**

11   v.

12   Central   Arizona   Water   Conservation
     District,

13
                         Defendant.
14

15         At issue is Defendant Central Arizona Water Conservation District's ("CAWCD")

16   Motion for Summary Judgment (Doc. 58, MSJ), to which Plaintiff Sharon Wilson filed a

17   Response[1] (Doc. 64, Resp.), and Defendant filed a Reply (Doc. 69, Reply). Plaintiff has

18   two remaining claims in this lawsuit: (Count 1) Retaliation in Violation of Title VII of the

19   Civil Rights Act of 1964 (Title VII), as amended 42 U.S.C. § 2000e *et seq.*; and (Count 3)

20   Employment Discrimination Based on Sex in Violation of Title VII.[2] For the reasons that

21   follow, the Court grants summary judgment to Defendant on Plaintiff's remaining claims.

22   _____

23   [1]       Defendant argues Plaintiff's husband is not a proper party to the claims asserted in
     the lawsuit under 42 U.S.C. § 2000e–2(a)(1) and 29 U.S.C. § 630(f). Plaintiff's husband,
24   Loren Wilson, was not employed at CAWCD, and Defendant argues he should be
     dismissed as a party. (MSJ at 6.) Plaintiff concedes that Loren Wilson was not employed
25   by CAWCD, and Plaintiff does not object to removing Loren Wilson as a party. (Resp.
     at 1.) The Court will therefore dismiss Loren Wilson's claims in this lawsuit.
26

27   [2]       Plaintiff's Complaint (Doc. 1) alleges Defendant discriminated against her under
     four separate theories: (1) Retaliation in Violation of Title VII; (2) Employment
28   Discrimination Based on Religion in Violation of Title VII; (3) Employment

# I.    BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiff Sharon Wilson, a female, brings employment-related sex discrimination and retaliation claims against her former employer, Defendant CAWCD. Defendant contends that its actions did not constitute discrimination or retaliation and it terminated her employment due to ongoing behavior issues.

## A.    Plaintiff's Employment History with Defendant

Defendant hired Plaintiff in February 2011 as an IT Infrastructure Supervisor. (Doc. 59, Def.'s Statement of Facts ("DSOF") ¶ 2; Pl.'s Resp. to DSOF ¶ 2.) Plaintiff was employed by Defendant until 2018, when she retired in lieu of termination. (DSOF ¶ 2; Pl.'s Resp. to DSOF ¶ 2.) Plaintiff reported to Phil Cook from 2011 to 2016 and then to Michael Ajamie. (DSOF ¶¶ 4–5; Pl.'s Resp. to DSOF ¶¶ 4–5.) During the relevant time period, Mr. Ajamie had eight direct reports, three of which were supervisors. (DSOF ¶ 6; Pl.'s Resp. to DSOF ¶ 6.) The three supervisors who reported to Mr. Ajamie were Plaintiff, who oversaw the IT Infrastructure Department; Greg Brinker, Supervisor of Enterprise Resource Projects; and Chris Santo, Supervisor of Data Integration. (DSOF ¶ 6; Pl.'s Resp. to DSOF ¶ 6.)

In the fall of 2016, Plaintiff began sharing details about her plans to retire; specifically, in her 2016 performance review, Plaintiff indicated that she intended to retire in about two years. (DSOF ¶ 16, Ex. 3 at 153:13–16, Ex. 6 at CAP_WILSON 000033, Ex. 14 ¶¶ 5, 15; Pl.'s Resp. to DSOF ¶ 16.) In September 2017, Plaintiff met with

Discrimination Based on Sex in Violation of Title VII; and (4) Employment Discrimination Based on Age in Violation of the Age Discrimination in Employment Act (ADEA). In Plaintiff's Response to Defendant's Motion for Summary Judgment, Plaintiff agrees that she has insufficient evidence of disparate treatment based on religion or age and her discrimination claim should be limited to discrimination based on sex. (Resp. at 12 n.2.) Accordingly, the Court dismisses Plaintiff's claims of discrimination based on religion and age and only addresses Plaintiff's Title VII claims of retaliation (Count 1) and sex discrimination (Count 3) in this Order.

Mr. Ajamie and reported issues of harassment about her religion and political views. (Doc. 65, Pl.'s Separate Statement of Facts ("PSOF") ¶ 1, Ex. B at 98:6–102:6.) In October 2017, Plaintiff took her complaint to Mr. Cook discussing the same issues she raised with Mr. Ajamie. (PSOF ¶ 2, Ex. B at 102:10–15, 113:10–17, 117:7–118:8; Ex. C at 62:20–65:5, 92:3–95:25.)

**B.    Plaintiff's Documented Performance and Behavior**

Mr. Cook indicated that he had ongoing issues regarding Plaintiff's behavior and that he addressed issues with Plaintiff verbally in performance reviews and in one-on-one meetings. (DSOF ¶ 20, Ex. 2 at 23:14–24; Pl.'s Resp. to DSOF ¶ 20.) Mr. Cook had also received complaints from other departments about Plaintiff's behavior. (DSOF ¶ 26, Ex. 2 at 74:23–75:8; Pl.'s Resp. to DSOF ¶ 26.)

**C.    Plaintiff's Performance Evaluation Meeting**

On December 5, 2017, Plaintiff met with Mr. Ajamie to discuss Plaintiff's 2017 performance review. (DSOF ¶ 45, Ex. 3 at 85:9–22, Ex. 15 at 87:8–88:23; Pl.'s Resp. to DSOF ¶ 45.) A performance review could either be rated "acceptable" or "unacceptable." (DSOF ¶ 46, Ex. 2 at 25:12–19; Pl.'s Resp. to DSOF ¶ 46.) Plaintiff was given an "acceptable" rating and was provided constructive and positive feedback. (DSOF ¶ 47, Ex. 7 at CAP_WILSON 000052–60; Pl.'s Resp. to DSOF ¶ 47.)

On December 6, 2017, Mr. Ajamie informed Plaintiff she would receive a 2% merit increase in a lump sum payment. (DSOF ¶ 49, Ex. 3 at 86:3–18, Ex. 15 at 352:17–353:10; Pl.'s Resp. to DSOF ¶ 49.) In 2017-18, merit increases were capped at 3%, which could take the form of a salary increase or lump sum bonus. (DSOF ¶¶ 41–42, Ex. 17 at CAP_WILSON 004545–4546, Ex. 18 at CAP_WILSON 003793; Pl.'s Resp. to DSOF ¶¶ 41–42). Mr. Ajamie had assumed Plaintiff would prefer her merit increase in a lump sum payment because she had expressed an intent to retire in 2018, the following year. (DSOF ¶¶ 49, 77, Ex. 3 at 153:13–16, 154:1–16, Ex. 14 ¶ 15, Ex. 15 at 353:2–10, Ex. 19 at CAP_WILSON 000066; Pl.'s Resp. to DSOF ¶ 49.) Plaintiff requested that the merit increase be awarded as an increase in her base pay, and Mr. Ajamie implemented this

1    change. (DSOF ¶¶ 51, 78, Ex. 14 ¶ 16, Ex. 15 at 353:8-14, Ex. 19 at CAP_WILSON

2    000066; Pl.'s Resp. to DSOF ¶ 51.)

3           Plaintiff alleges that she disagreed with her performance evaluation and raise and

4    that when she expressed her concerns and accused Mr. Ajamie of being discriminatory,

5    Mr. Ajamie was defensive and yelled at her, so she left the meeting. (DSFO ¶ 52, Ex. 3 at

6    87:2–21; Pl.'s Resp. to DSOF ¶ 52.) Mr. Ajamie met with HR Manager Mr. Wilson to

7    discuss his meeting with Plaintiff, and Mr. Ajamie told Mr. Wilson that the meeting with

8    Plaintiff did not go well. (DSOF ¶ 54, Ex. 21; Pl.'s Resp. to DSOF ¶ 54.) Mr. Ajamie

9    explained that Plaintiff got upset, complained about other employees, shook the evaluation

10   at him, and yelled at him on several occasions. (DSOF ¶ 54, Ex. 21; Pl.'s Resp. to DSOF

11   ¶ 54.)

12          On January 29, 2018, Plaintiff and Mr. Ajamie met to discuss Plaintiff's goals for

13   the coming year. (DSOF ¶ 56, Ex. 3 at 104:11–25, Ex. 15 at 319:1–22.) Mr. Ajamie alleges

14   that during this meeting, Plaintiff shouted at him so loudly that other employees could hear.

15   (DSOF ¶ 56, Ex. 2 at 104:4–25, Ex. 15 at 319:1–22.) On January 31, 2018, Mr. Cook met

16   with Bonnie Stone, the Director of Employee Services who oversees the Human Resources

17   Department, to discuss the January 29, 2018 incident. (DSOF ¶ 58, Ex. 2 at 107:13–19,

18   108:13; 309:14–311:25, Ex. 5 ¶¶ 7–8, Ex. 22.) The same day, Plaintiff made a complaint

19   to HR Manager Mr. Wilson that Mr. Ajamie shouted at her and acted in a threatening way

20   during the meeting on January 29. (DSOF ¶ 59, Ex. 5 ¶¶ 10–11.) Plaintiff also explained

21   to Mr. Wilson that Mr. Ajamie engaged in age, gender, religious, and "political"

22   harassment against her. (DSOF ¶ 62, Ex. 24 at CAP_WILSON 000191–192; Pl.'s Resp. to

23   DSOF ¶ 62.) On February 1, 2018, Mr. Ajamie met with Mr. Wilson to discuss the

24   January 29 meeting. (DSOF ¶ 60, Ex. 23 at CAP_WILSON 000193–194; Pl.'s Resp. to

25   DSOF ¶ 60.)

26          **D.    The First Investigation and Plaintiff's Subsequent Corrective Action Plan**

27          As part of an investigation, Plaintiff told Sandy Robinson, Senior HR Generalist,

28   that her gender discrimination claims stemmed from the fact that Mr. Ajamie would hold

meetings with the men on Plaintiff's staff without notifying her. (DSOF ¶ 83, Ex. 19 at CAP_WILSON 000067.) Plaintiff did not express concerns that her 2017 performance review and raise were based on discrimination nor did she express concerns regarding the January 29, 2018 meeting with Mr. Ajamie.[3] (DSOF ¶ 84, Ex. 19 at CAP_WILSON 000065.) Plaintiff's primary concern with the investigation was that she was not aware that her conduct was being investigated in addition to Mr. Ajamie's.[4] (DSOF ¶ 74, Ex. 3 at 175:2-5.)

As part of the investigation, Gail Ulan and JoAnn McConnaughey, two other female employees, were interviewed, and both stated that they did not think Mr. Ajamie treated men and women differently. (DSOF ¶ 101, Ex. 35 at CAP_WILSON 000082, Ex. 36 at CAP_WILSON 000077; Pl.'s Resp. to DSOF ¶ 101.) After the investigation, HR found that Plaintiff's allegations were not substantiated, she had engaged in unprofessional conduct, and a Corrective Action was warranted. (DSOF ¶ 106, Ex. 14 ¶ 43, Ex. 39 at CAP_WILSON 000118–121, Ex. 40 at CAP_WILSON 000116–117, Ex. 41 at CAP_WILSON 000113–115.)

The Corrective Action issued was a written warning. (DSOF ¶ 106, Ex. 14 ¶ 43, Ex. 39 at CAP_WILSON 000118-121, Ex. 40 at CAP_WILSON 000116-117, Ex. 41 at CAP_WILSON 000113-115.) The Corrective Action was written by HR on behalf of and signed by Mr. Ajamie. (DSOF ¶ 108, Ex. 14 ¶ 48, Ex. 15 at 113:1–25, Ex. 43 at CAP_WILSON 000130–133.) On March 15, 2018, Ms. Robinson met with Plaintiff to tell her the findings from the investigation. (DSOF ¶ 107, Ex. 14 ¶ 46; Pl.'s Resp. to DSOF ¶ 107.) Plaintiff disagreed with the findings and insisted that the people interviewed had been untruthful. (DSOF ¶ 107, Ex. 14 ¶ 46, Ex. 42; Pl.'s Resp. to DSOF ¶ 107.)

On April 4, 2018, Plaintiff appealed the Corrective Action by submitting an internal grievance called a CAP Resolve. (DSOF ¶ 113; Pl.'s Resp. to DSOF ¶ 113.) Plaintiff did not provide new information and claimed the investigation was retaliatory for her

---

[3] Although Plaintiff purports to dispute this, no evidence supports her position.

[4] Plaintiff again purports to dispute this, but the evidence does not support her position.

complaint alleging Mr. Ajamie discriminated against her. (DSOF ¶¶ 63, 113, Ex. 25 at 000135–137; Pl.'s Resp. to DSOF ¶¶ 63, 113.) Plaintiff amended the CAP Resolve twice, on April 19, 2018, and May 2, 2018. (DSOF ¶¶ 63, 113, Ex. 25 at 000135–137, Ex. 44 at CAP_WILSON 000174–177, Ex. 45 at CAP_WILSON 000179–181, Ex. 47 at 244:13–18; Pl.'s Resp. to DSOF ¶¶ 63, 113.)

### E.   The Second Investigation

On April 19, 2018, Plaintiff met with Aaron Favata and Steve Tillman, her subordinates, who were identified in the Corrective Action, separately. (DSOF ¶ 114; Pl.'s Resp. to DSOF ¶ 114.) Later that month, HR Manager Mr. Wilson interviewed Mr. Favata, Mr. Tillman, Plaintiff, and several other employees who reported to Plaintiff as part of the second investigation. (DSOF ¶ 119, Ex. 20 at 163:17–24, Ex. 49 at WILSON 000001–4, Ex. 50 at CAP WILSON at 000230.) Mr. Favata and Mr. Tillman each alleged that in the April 19 meetings, Plaintiff made statements to them indicating she believed her Corrective Action resulted from the statements they had made to HR in the first investigation. (DSOF ¶ 120, Ex. 51 at CAP_WILSON 000227–228, Ex. 52 at CAP_WILSON 000225–226.) After this investigation, Plaintiff was placed on paid administrative leave. (DSOF ¶ 123, Ex. 14 ¶ 50; Pl.'s Resp. to DSOF ¶ 123.)

Mr. Ajamie, Mr. Cook, Mr. Wilson, Ms. Stone, Ms. Robinson, Senior Counsel Kim Grouse, General Counsel Jay Johnson, and General Manager Ted Cooke met to discuss the second investigation and ultimately decided Plaintiff should be terminated. (DSOF ¶¶ 125, 127, Ex. 1 ¶¶ 3, 6–9, Ex. 5 ¶¶ 22, 25; Pl.'s Resp. to DSOF ¶¶ 125, 127.) Mr. Cook and Ms. Stone met with Plaintiff on May 24, 2018, and offered her the opportunity to resign in lieu of termination, which would allow her to receive 50% of her accrued sick leave. (DSOF ¶ 128, Ex. 3 at 192:20–193:3, Ex. 5 ¶ 26, Ex. 54 at CAP_WILSON 000290–91; Pl.'s Resp. to DSOF ¶ 128.) Plaintiff's retirement date was set for June 11, 2018, so that she could receive an increase in her retirement. (DSOF ¶ 128, Ex. 5 ¶ 26, Ex. 54 at CAP_WILSON 000290–91; Pl.'s Resp. to DSOF ¶ 128.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.    Plaintiff's EEOC Charge

On August 3, 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (DSOF ¶ 129, Ex. 55 at CAP_WILSON 000184-185.) In her EEOC Charge, Plaintiff did not identify that Mr. Cook made discriminatory comments regarding Plaintiff's gender. (DSOF ¶ 132; Pl.'s Resp. to DSOF ¶ 132.) Plaintiff testified that Mr. Ajamie never made comments about her being old but that she believed Mr. Ajamie's offer to give her a lump sum payment of her merit increase was age discrimination. (DSOF ¶¶ 134, 136, Ex. 3 at 97:15–23, 186:1–7; Pl.'s Resp. to DSOF ¶¶ 134, 136.)

## II.    LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

1  "A summary judgment motion cannot be defeated by relying solely on conclusory
2  allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.
3  1989). "Summary judgment must be entered 'against a party who fails to make a showing
4  sufficient to establish the existence of an element essential to that party's case, and on
5  which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d
6  1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

7  **III.    ANALYSIS**

8  **A.    Plaintiff's Title VII Claim of Discrimination Based on Sex**

9  Defendant first moves for summary judgment as to Plaintiff's Title VII claim for
10 Employment Discrimination Based on Sex. (MSJ at 6.)

11 **1.    Title VII Sex Discrimination Legal Standard**

12 Under Title VII, an employer may not "discriminate against an individual with
13 respect to [her] . . . terms, conditions, or privileges of employment" because of her sex.
14 42 U.S.C. § 2000e–2(a). "This provision makes 'disparate treatment' based on sex a
15 violation of federal law." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th
16 Cir. 2002).

17 In order to show disparate treatment under Title VII, Plaintiff must first establish a
18 *prima facie* case of discrimination as the United States Supreme Court set forth in
19 *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Specifically, she must show
20 that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was
21 subjected to an adverse employment action; and (4) similarly situated men were treated
22 more favorably, or her position was filled by a man." *Villiarimo*, 281 F.3d at 1062 (citing
23 *McDonnell Douglas*, 411 U.S. at 802). The degree of proof necessary to establish a *prima
24 facie* case for a Title VII claim on summary judgment "is minimal and does not even need
25 to rise to the level of a preponderance of the evidence." *Id*. (internal citations and quotations
26 omitted).

27 "If the plaintiff establishes a *prima facie* case, the burden of production—but not
28 persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory

reason for the challenged action . . . . If the employer does so, the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (internal citations and quotations omitted). A plaintiff may rely on circumstantial evidence to demonstrate pretext, but such evidence must be both specific and substantial. *Id.* At the last step, if the plaintiff can show pretext, the only remaining issue is whether discrimination occurred or not. *Id.*

### 2. Plaintiff Can Establish a *Prima Facie* Case

Under the *McDonnell Douglas* framework, "[t]he requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Chuang v. Univ. of Cal. Davis, Bd. Of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (citation omitted). The parties do not dispute the fact that Plaintiff was part of a protected class based on her sex or that she was qualified for the position she held. Defendant instead argues that Plaintiff has not shown that she was subjected to an adverse employment action or that similarly situated individuals outside her protected class were treated more favorably. (MSJ at 10, 13–15.)

### a. Adverse Employment Action

An adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008); *Chuang*, 225 F.3d at 1126. The most obvious incident that occurred that could constitute an adverse employment action—and Defendant concedes as much— is Plaintiff being terminated. (MSJ at 11); *see Davis*, 520 F.3d at 1094. Being terminated, or given the option to retire, as Plaintiff was given, materially affected Plaintiff's terms and privileges of employment. Thus, Plaintiff has met her burden to proffer evidence to meet the "adverse employment action" prong of the *McDonnell Douglas* test. 433 U.S. at 802; *Celotex*, 477 U.S. at 323.

The parties dispute whether other events or comments constituted adverse employment actions. To begin with, the evidence shows that Mr. Ajamie's offer to give Plaintiff her merit increase as a lump sum payment was not an adverse employment action. When Mr. Ajamie initially offered the merit increase as a lump sum payment, Plaintiff became upset because she wanted the merit increase to be added to her base pay. Mr. Ajamie offered that Plaintiff discuss the options of the merit increase payment with her husband and that if she still wanted the increase to her base pay, he would make that change for her, which he ultimately did. (DSOF ¶¶ 49–50, Ex. 15 at 352:20–353:14.) Because Plaintiff was awarded her merit increase in the way she requested, there was no adverse employment action.

Plaintiff interpreted Mr. Ajamie's comment regarding discussing her options with her husband to be discriminatory, and Mr. Ajamie stated in his deposition that he is not sure he would have made a similar comment to a male employee. (PSOF ¶ 9, Ex. A at 356:4–21.) Defendant contends that this comment was not an adverse employment action because it had no effect on Plaintiff's employment. (MSJ at 11.) Plaintiff argues that "stray comments" can constitute an adverse employment action when the comments viewed collectively with other evidence show they affected an individual's employment. Specifically, Plaintiff argues that this comment, together with the evidence that Defendant was attempting to force Plaintiff into retirement, was an adverse employment action. (Resp. at 11.) First, Plaintiff's allegation that Defendant tried to force her into retirement does not relate in timing or substance to her claims of sex discrimination or retaliation under Title VII. Though this allegation may have been related to Plaintiff's age discrimination claim, Plaintiff dropped that claim. Second, Mr. Ajamie's comment to Plaintiff about discussing the merit increase with her husband seems to be the only comment of its nature. Plaintiff does not explain or attempt to show how this comment was tied to sex discrimination nor does she describe how it affected her employment. As such, the Court finds that Mr. Ajamie's comment was not an adverse employment action.

1

### b.     Similarly Situated Employees

Individuals are similarly situated when "they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. Defendant asserts that Plaintiff "has not identified any similarly situated individuals outside of her protected class who were treated more favorably." (MSJ at 13–15.) Plaintiff contends that Chris Santo and Greg Brinker—two other members of the IT team—were also described by Mr. Ajamie as being "highly dysfunctional" and had to go to HR for intervention because they fought so much. (PSOF ¶¶ 29–30, Ex. A 67:23–73:19, 138:5–139:23, 203:22–204:25.) Plaintiff argues she was acting no different than the other two men, but she was the only one fired.

The record indicates that Mr. Brinker was part of the IT team that was broadly characterized as "highly dysfunctional," but the record does not contain specific details that might show how Mr. Brinker, individually, was similarly situated. *See Vasquez*, 349 F.3d at 641–42 (noting the plaintiff was not similarly situated to his co-worker because the co-worker "did not engage in problematic conduct of comparable seriousness to that of" the plaintiff, who had disobeyed a direct order from his supervisor). Though the IT department was characterized as "highly dysfunctional," Mr. Brinker was noted to have a highly functional team. (DSOF ¶ 14; Ex. 15 at 51:22–24.)

On the other hand, Mr. Santo engaged in seemingly similar conduct to Plaintiff that is described in more detail in the record, and he was ultimately removed from his supervisor position. (PSOF ¶¶ 11, 30, Ex. A at 52:19–25, 203:22–204:25, 365:13–367:14.) Defendant argues Mr. Santo being removed from his supervisor position is more significant than Plaintiff's initial written warning. (MSJ at 14; DSOF ¶ 15.) But Mr. Santo was only taken out of his supervisory role after Mr. Ajamie was no longer overseeing the IT department and after Plaintiff was terminated. (PSOF ¶ 30, Ex. A at 365:13–367:14.) Mr. Ajamie did not initiate a Corrective Action for Mr. Santo, despite the fact that he was running an allegedly highly dysfunctional team at the same time Plaintiff was issued a Corrective Action for similar conduct. (Ex. A at 366:10–24.)

- 11 -

Plaintiff also argues that even if Mr. Brinker and Mr. Santo did not have the same number of complaints against them, her 2% merit increase was less than Mr. Brinker and Mr. Santo's increases and was awarded to her before the complaints against her were documented in the investigation, such that her merit increase constituted unfavorable treatment. (Resp. at 12; PSOF ¶¶ 3–6.) In 2017, Plaintiff received a 2% merit increase, while Mr. Brinker received a 2.75% merit increase and Mr. Santo received a 3% merit increase. (Resp. at 12; PSOF ¶¶ 10–11, 30, Ex. K.) Although Plaintiff argues her 2% merit increase was the result of sex discrimination because Mr. Brinker and Mr. Santo received higher merit increases, the evidence also shows that, in 2017, the person to receive the highest merit increase was a woman, Gail Ulan. (DSOF ¶ 43, Ex. 15 at 146:15–18, 147:18–21, Ex. 18 at CAP_WILSON 003793; Pl.'s Resp. to DSOF ¶ 43.) And the year prior, Mr. Ajamie gave Plaintiff the highest merit increase of any of his subordinates. (DSOF ¶ 44, Ex. 15 at 75:22–76:2; Pl.'s Resp. to DSOF ¶ 44.)

The Court finds that Plaintiff has produced at least the required minimal evidence regarding whether Mr. Ajamie treated similarly situated employees outside of the protected class—male supervisory employees in the IT department—more favorably. Because Plaintiff has provided some evidence of an adverse employment action and that similarly situated employees may have been treated more favorably, she meets her burden at this first stage of establishing a *prima facie* claim of sex discrimination. *McDonnell Douglas*, 433 U.S. at 802–05; *Celotex*, 477 U.S. at 323.

### 3.    Defendant Has Articulated Legitimate, Nondiscriminatory Reasons for the Adverse Employment Action

The burden of production now moves to Defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Villiarimo*, 281 F.3d at 1062. Defendant has produced extensive evidence of Plaintiff's behavioral issues during meetings and cites to complaints about Plaintiff's behavior in workplace meetings throughout 2017. (MSJ at 10; DSOF ¶¶ 17–39.) Mr. Cook received complaints about Plaintiff from other departments, he heard her make disparaging remarks about her

coworkers, and he heard her yell at Mr. Ajamie. (DSOF ¶¶ 26, 38, 90.) Even after receiving verbal counseling and a written warning, Plaintiff continued to act unprofessionally. (MSJ at 10; DSOF ¶¶ 114–22.) Defendant argues it had legitimate reasons to take disciplinary measures against Plaintiff and to place her on administrative leave during the second investigation. (MSJ at 14–15.)

The evidence shows that Plaintiff received numerous complaints and that neither Mr. Santo nor Mr. Brinker had the same number of complaints against them. (DSOF ¶ 12, Ex. 2 at 331:2–332:13, Ex. 5 ¶ 28, Ex. 6 at CAP_WILSON 000033-43, Ex. 7 at CAP_WILSON 000059, Exs. 8–13.) Mr. Cook described that Plaintiff had interpersonal relationship issues with staff throughout most of her career. (DSOF ¶ 17; Ex. 2 at 22:13–20; 271:8–294:9.) As part of the first investigation, several employees expressed concern with Plaintiff's behavior. Mr. Cook told Ms. Robinson in his interview that he received complaints from employees and vendors regarding Plaintiff's communication and poor customer service and that four of Defendant's biggest vendors expressed that they preferred not to work with Plaintiff. (DSOF ¶ 90, Ex. 29 at CAP_WILSON 00089–91.) Mr. Ajamie told Ms. Robinson that in 2016 Plaintiff got the highest percent increase of all his supervisors but that in 2017 she got the lowest "due to her interpersonal behavior, poor treatment of others, and because her teamwork effort with the management team took a sharp decline." (DSOF ¶ 91, Ex. 30 at CAP_WILSON 000104–108.) Mr. Cook noted that in 2017, Plaintiff would sigh loudly, roll her eyes, grunt, raise inappropriate complaints, have side conversations, and be on her phone during meetings. (DSOF ¶ 23; Ex. 2 at 120:6–21, 123:9–21.)

On February 14, 2017, Kelli Ramirez, another employee, complained to Mr. Cook that Plaintiff was "bitchy" when discussing requests with her. (DSOF ¶ 28, Ex. 2 at 113:11–114:3, 293:10–294:14, Ex. 16 at CAP_WILSON 000164.) On November 7, 2017, Mr. Brinker told Mr. Cook that he could not talk to Plaintiff's employees without Plaintiff getting mad and giving him dirty looks. (DSOF ¶ 29, Ex. 2 at 169:5–13, Ex. 16 at CAP_WILSON 000165.) On the same day, Mr. Santo told Mr. Cook that Plaintiff was the

center of the IT management dysfunction, that she was always negative, and that she did not want to work together to solve issues. (DSOF ¶ 30, Ex. 2 at 169:17–23, Ex. 16 at CAP_WILSON 000165.) Likewise, Brian Pendergrass, one of Plaintiff's former subordinates, told Mr. Cook that things had been bad with Plaintiff and he was glad to be away from her division. (DSOF ¶ 31, Ex. 2 at 300:1–13, Ex. 16 at CAP_WILSON 000165, Ex. 32 at CAP_WILSON 000095.)

On November 27, 2017, Scott Isom, an IT data base analyst reporting to Mr. Brinker, told Mr. Cook that Plaintiff got mad at him when he talked to Plaintiff's employees and mentioned that Plaintiff "likes to fight on everything." (DSOF ¶ 32, Ex. 2 at 301:13–302:6, Ex. 16 at CAP_WILSON 000166.) The same day, Patrick McCabe in IT security told Mr. Cook that Plaintiff was "out of control . . . . It is one thing to be in a bad mood all the time but employees feel like they walk on egg shells whenever she is around." (DSOF ¶ 33, Ex. 2 at 301:3–12, Ex. 16 at CAP_WILSON 000166.) On December 5, 2017, Corey O'Brien told Mr. Cook that it was a disaster working with Plaintiff, she conspires with employees to set traps for other people, and most people try to avoid working with her because she makes things more difficult. (DSOF ¶ 34, Ex. 16 at CAP_WILSON 000166.)

On January 9, 2018, IT project manager Sara Ainswoth said that she could not get anything done because of Plaintiff's negative attitude. (DSOF ¶ 35, Ex. 16 at CAP_WILSON 000167.) Ms. Ainswoth began to cry explaining that she was emotional because things with Plaintiff had been so difficult. (DSOF ¶ 35, Ex. 16 at CAP_WILSON 000167.) On January 10, 2018, Mike Lewis, IT Project Manager, discussed the difficulties of working on projects and stated that things were better now that he was not working with Plaintiff as much. (DSOF ¶ 36, Ex. 2 at 286:25–287:24, 307:11–23, Ex. 16 at CAP_WILSON 000167.) Gail Ulan reported that Plaintiff often does not agree with others and shows her disagreement by huffing, sighing, and staring at her phone. (DSOF ¶ 99, Ex. 16 at CAP_WILSON 000167, Ex. 35 at CAP_WILSON 000081–83.) On January 17, 2018, Mr. Tillman, Plaintiff's subordinate, said he felt Plaintiff was threatening him by not

extending his new employee probation and expressed concern about losing his job. (DSOF ¶ 37, Ex. 2 at 307:24–308:24, Ex. 16 at CAP_WILSON 000168.) Mr. Favata, Plaintiff's other subordinate, said that Plaintiff would threaten him with his new employee probationary period but did not provide substantive goals so that he could improve and that he was afraid of losing his job. (DSOF ¶ 95, Ex. 31 at CAP_WILSON 000093–94.)

Defendant has clearly shown legitimate, nondiscriminatory reasons for the challenged action. *See Villiarimo*, 281 F.3d at 1062. The complaints regarding Plaintiff's behavior and treatment of others are extensive and warranted Defendants' investigation and corrective steps.

### 4.   Plaintiff Has Not Established a Material Factual Dispute as to Whether Defendant's Reason was Pretext

The burden now shifts back to Plaintiff to show Defendant's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1123. "Direct evidence is evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (internal citation and quotations omitted). Where direct evidence is unavailable, a plaintiff may provide circumstantial evidence to show that the defendant's explanation for the challenged action was mere pretext for discrimination. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 642.

Here, Plaintiff has not proffered specific and substantial circumstantial evidence that Defendant's reasoning for terminating Plaintiff's employment was mere pretext for discrimination. Plaintiff's most significant argument is that at the time of her performance review, when she was awarded the 2% merit increase and received an "acceptable" review, she had no complaints against her. (PSOF ¶¶ 7, 12, 16–18.) Plaintiff alleges that the complaints Defendant collected against her as well as Mr. Cook's encouraging Mr. Ajamie

to take better notes of his meetings with his employees, were all part of a larger plan to create a "deep record" to support adverse actions against her. (Resp. at 13.) In the latter regard, Defendant contends Plaintiff mischaracterizes Mr. Cook's conversations with Mr. Ajamie about taking meeting notes and Mr. Cook's thoroughness with taking meeting notes. (Reply at 2; PSOF ¶ 3.) Mr. Cook conducted meetings with all of his employees, and he indicated that the volume of meeting notes discussing Plaintiff's conduct just reflects her significant role in creating low morale in the department. (Reply at 2; DSOF at ¶ 27, Ex. 2 at 96:10–22.)

Plaintiff's suspicion that there was a scheme to develop a "deep record" against her is not supported by the evidence. Plaintiff claims that she had not received constructive feedback or complaints lodged against her prior to the first investigation. But the record indicates otherwise, and Mr. Cook said Plaintiff did not take constructive feedback well and struggled with accountability. (DSOF ¶ 19, Ex. 2 at 83:24–84:12, 278:17–21.) In a 2017 evaluation, Mr. Ajamie noted that Plaintiff had opportunities to improve her communication and collaboration skills. (Ex. D at 223.) In her 2016 evaluation, Mr. Ajamie wrote that teamwork was an area for improvement. (Ex. D at 234.) In the 2016 evaluation, Plaintiff also expressed to Mr. Ajamie her challenges working with peer supervisors and indicated that they had also expressed challenges. (Ex. D at 234.) She encouraged Mr. Ajamie to get involved. (Ex. D at 234.)

Additionally, Plaintiff's claims of sex discrimination were not corroborated by any other female employees. (Reply at 4; PSOF ¶ 19, Ex. H.) Although Plaintiff suggests that other women corroborated her claims that Mr. Ajamie discriminated based on sex, those allegations were only supported by a citation back to Plaintiff's own statement of facts and deposition. (Resp. at 13; PSOF ¶ 19.) After a thorough review of the evidence and viewing it in the light most favorable to Plaintiff, the Court finds that no reasonable jury could conclude that Defendant's articulated reasons for taking an adverse employment action

against Plaintiff were pretextual. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII claim of discrimination based on sex.

### B.     Plaintiff's Title VII Claim of Retaliation

Title VII also makes it an unlawful employment practice for an employer to retaliate against an employee because she has opposed any practice made unlawful by Title VII or because she has made a charge, testified, assisted, or participated in any manner in an investigation under Title VII. 42 U.S.C. § 2000e–3(a).

#### 1.     Title VII Retaliation Legal Standard

The *McDonnell Douglas* burden-shifting framework may be applied to Title VII retaliation claims. *See Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir. 1986.) A plaintiff may establish a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Finally, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretext for a discriminatory motive. *Id.*

#### 2.     Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation

With regard to the second element of a *prima facie* Title VII retaliation claim, a plaintiff must show that the alleged adverse employment actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Ninth Circuit construes adverse employment action broadly and has found that a "wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray*, 217 F.3d at 1240.

Plaintiff contends there were three adverse actions that were retaliatory. First, although Plaintiff admits that her 2017 evaluation does not constitute an adverse

employment action, she contends the 2% merit increase was adverse and that it came shortly after she complained to Mr. Cook about Mr. Ajamie on October 31, 2017. (Resp. at 15; PSOF ¶ 2.) Defendant argues that a raise is not an adverse employment action merely because Plaintiff thought she deserved a bigger raise. (MSJ at 21–22.) Defendant points out that Plaintiff has failed to provide any evidence to show why she should have received a higher merit increase. The Court agrees. Plaintiff has not brought forth any such evidence and accordingly has failed to show the 2% merit increase amounted to an adverse employment action in retaliation for her complaint about Mr. Ajamie.

Second, Plaintiff contends that after she made a complaint to HR alleging discrimination against Mr. Ajamie, she was never informed that she too was being investigated. (Resp. at 15; PSOF ¶¶ 15–17, 20, 35–37.) Additionally, Plaintiff argues it was an adverse employment action when HR decided it would issue a Corrective Action for Plaintiff before the investigation even began. (Resp. at 15; PSOF ¶¶ 15–17, 20, 35–37.) To the extent Plaintiff's contentions amount to a challenge to the adequacy of Defendant's investigation procedures, Defendant rightly points out that failure to conduct an adequate investigation is not considered an adverse employment action for purposes of retaliation. (MSJ at 22); *see Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011).

The investigation began after the January 29, 2018 meeting between Plaintiff and Mr. Ajamie where Plaintiff allegedly yelled at Mr. Ajamie so loudly that other people outside of the room could hear her yelling. (DSOF ¶ 56, Ex. 2 at 104:4–25, Ex. 15 at 319:1-22.) The Court agrees with Defendant that an investigation cannot be an adverse employment action for purposes of retaliation when the credible allegations investigated by the employer are later found to be justified. *See Williams v. Modly*, 796 F. App'x 378, 380 (9th Cir. 2020).

And even assuming that the investigation—and beginning the investigation without informing Plaintiff she was the subject of the investigation—were adverse actions, Plaintiff cannot establish causation. In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court decided that a plaintiff has a heightened standard for proving causation

in retaliation claims—she must show that her engagement in a protected activity was a "but-for" cause of the defendant's imposition of an adverse employment action. 570 U.S. 338, 362 (2013). Here, there is overwhelming evidence that Plaintiff's behavior towards other employees was the reason she was under investigation and placed on a Corrective Action. Plaintiff has not provided evidence to show that raising the issue of discrimination was the but-for cause of the investigation and the investigation outcome, nor has she demonstrated that raising discrimination was the but-for cause of her not being informed that her conduct was part of the investigation.

Finally, Plaintiff contends that after the first investigation, she raised concerns that if she gave critical feedback to her subordinates, Mr. Favata and Mr. Tillman, it would be perceived as retaliation on her part, and in response she was told by HR Manager Mr. Wilson that she would need to continue to address any of their performance concerns. (Resp. at 16; PSOF ¶¶ 25–26.) And Plaintiff contends that as soon as she met with Mr. Favata and Mr. Tillman to address their performance issues, her conduct was found to be retaliation for the first investigation and she was terminated from her employment. (Resp. at 16; PSOF ¶ 26.)

The evidence shows that, on April 19, 2018, Plaintiff met with Mr. Favata and Mr. Tillman separately, recorded the conversations in violation of Defendant's Information Security Policy, and asked them how their names got into her Corrective Action. (DSOF ¶¶ 114–18.) In these meetings, Plaintiff implied that their participation in discussing her behavior with Mr. Cook and Mr. Ajamie resulted in her Corrective Action. (DSOF ¶¶ 114–18.) After these meetings, Defendant's management reviewed Ms. Robinson's investigation of Plaintiff and Plaintiff's CAP Resolves challenging Ms. Robinson's investigation. (DSOF ¶ 124, Ex. 1 ¶ 5, Ex. 5 ¶ 19.) After considering the evidence, management found that Plaintiff had retaliated against her subordinates in violation of the Corrective Action and that, given her repeated violations of company policy, termination was appropriate. (DSOF ¶ 126, Ex. 1 ¶ 6, Ex. 5 ¶¶ 22–24.) Again, Plaintiff has not shown causation, that is, that she was fired from her employment because she alleged

discrimination. On the contrary, the evidence shows that, in meetings with subordinates, Plaintiff violated her Corrective Action, causing her loss of employment. Because Plaintiff has failed to provide sufficient evidence of an adverse employment action or causation to make out a Title VII retaliation claim, Defendant is entitled to summary judgment on that claim.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 58) on all of Plaintiff's claims.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment accordingly and close this case.

Dated this 16th day of February, 2021.

Honorable John J. Tuchi
United States District Judge